COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS



| | | |
|---|---|---|
| THE CITY OF EL PASO, TEXAS, | § | No. 08-22-00155-CV |
| Appellant, | § | Appeal from the |
| v. | § | 171st District Court |
| JOANNA CANGIALOSI, individually, and as next of friend of C.C., a minor child, surviving daughter, and as heir to the Estate of Annette Martinez; JOSE AGUILAR; RAYMOND AGUILAR; FIDEL AGUILAR; and ERIC AGUILAR, individually and as surviving sons and heirs to the Estate of Annette Martinez, | § | of El Paso County, Texas |
| | § | (TC# 2018DCV0797) |
| Appellees. | § | |

## MEMORANDUM OPINION

Before us is Appellant The City of El Paso's (El Paso) second interlocutory appeal of a denial of a plea to the jurisdiction. In the first appeal, we affirmed the trial court's denial of the plea because Appellees—the victims of a traffic collision who allege was caused by the El Paso Police Department's (EPPD) improper vehicular pursuit of two suspected burglars—had raised sufficient facts to implicate the motor-vehicle waiver to El Paso's governmental immunity under the Texas Tort Claims Act (TTCA). *City of El Paso v. Cangialosi*, 632 S.W.3d 611, 626

(Tex. App.—El Paso 2020, no pet.) (*Cangialosi I*); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1). Specifically, we held there were "sufficient facts to show some nexus between the police use of a vehicle and the accident[.]" *Cangialosi*, 632 S.W.3d at 626. In its second plea to the jurisdiction, which is the subject of this appeal, El Paso argues that even if Appellees' damages arose from the operation of a motor vehicle, they did not raise sufficient facts to satisfy the second element of the motor vehicle waiver: that the involved police officers would be personally liable under Texas law. We disagree. For the following reasons, we affirm the trial court's denial of El Paso's second plea to the jurisdiction.

## I. BACKGROUND

We laid out the facts of this case in detail in *Cangialosi I.* Consequently, here we only provide the facts necessary to resolve this appeal.

In short, Appellees claim that on March 4, 2016, EPPD officers were conducting surveillance in an El Paso neighborhood that had recently experienced several home burglaries. After watching Aaron Roacho and Jacob Sanchez commit a suspected burglary, Officer Nicholas Villalobos began to follow their vehicle in an unmarked police car. Several other unmarked police vehicles and one marked police unit, which Officer Humberto Herrera was driving, also followed the suspected burglars.

At approximately the same time, Appellee Joanna Cangialosi was driving with her then six-month-old daughter, C.C., and her mother, Annette Martinez. The vehicle driven by Roacho struck Cangialosi's vehicle while she was waiting at a red light at the intersection of Stanton Street and Schuster Ave. Moments later, Officer Villalobos struck another vehicle stopped at the same intersection with his unmarked unit. EPPD's traffic investigator calculated that Roacho was traveling at a minimum speed of 57 miles per hour and that Officer Villalobos was going at least

2

60 miles per hour before the accident. "The speed limit is 30 mph along that part" of Stanton Street. *Cangialosi*, 632 S.W.3d at 619. The accident killed Annette Martinez and injured both Cangialosi and C.C.

El Paso filed its first plea to the jurisdiction in April 2019, arguing there was insufficient evidence to demonstrate the applicability of the motor-vehicle waiver to the general rule of governmental immunity under the TTCA. Specifically, it argued there was no evidence that the officers were pursuing the suspected burglars, there was no evidence the suspected burglars knew the police were following them,   and the Appellees' injuries were caused by the independent acts of Roacho, not the EPPD officers' use of a vehicle. The trial court denied the plea to the jurisdiction, and this Court affirmed, holding that Appellees "have at least raised a fact issue as to whether Roacho appreciated that the police were in pursuit at the time of the crash" and it was "the pursuit by the police in their vehicles . . . that is *alleged* to have caused Roacho to speed, as he fled to get away." *Id.* at 623, 626. Because speed is the claimed cause of the accident, we found that Appellees "raised sufficient facts to show some nexus between the police use of a vehicle and the accident to defeat the plea to the jurisdiction." *Id.* at 626.

Over three years later—and just weeks before trial—El Paso filed its second plea to the jurisdiction. It correctly claimed the TTCA required a showing of two elements before the motor-vehicle waiver applies: (1) that the damages arise "from the operation or use of a motor-driven vehicle"; and (2) "the employee would be personally liable to the claimant according to Texas law[.]" TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1). El Paso focused its second plea to the jurisdiction on this second element, claiming the officers involved in the accident could not be personally liable to Appellees because they are protected by official immunity. Consequently, according to El Paso, the motor-vehicle waiver does not apply, and it is immune from suit.

3

To support its plea, El Paso provided the following evidence. Both Villalobos and Herrera submitted affidavits outlining their thought processes the day of the accident. Regarding following Roacho and Sanchez as they fled from an apparent burglary, Villalobos explained:

7. In my view I witnessed what I reasonably believed to be a burglary of a habitation. This is a serious felony offense and inherently violent crime and there is always a risk of serious injury or death to any occupants of the home, especially because suspects of this type of serious offense often conduct burglaries with deadly weapons. Once the suspects fled at a high speed, I determined that the immediate apprehension of the suspects was necessary given the nature of the offense and the manner in which the suspects were driving. Additionally, we had probable cause based on the fact that I and my colleagues saw the suspects fleeing the house in a hurry carrying property and based on the search of the license plate. Based on my understanding at the time, it was reasonable to believe that the same suspects had committed another serious burglary of a habitation the day before and that there was a high probability that they would continue to commit the same or similar offenses if they were not immediately apprehended.

8. Once the suspects fled at a high rate of speed, I was the closest vehicle with visual contact of the suspects' vehicle and if I did not begin and continue to follow their vehicle to maintain a visual contact, there was a chance that the suspects would get away. None of my colleagues would likely be able to reasonably locate or follow the suspects and visual contact was necessary to assist my colleague Officer Herrera in the marked vehicle to conduct the controlled stop. If I had not followed the suspects there is a likelihood that they would have evaded arrest and had the opportunity to continue their criminal activities.

Regarding his assessment of the risk his following the suspected burglars posed to the public, Villalobos explained:

9. To maintain a visual contact of the suspects I had to travel at a rate of speed faster than the regular traffic on Stanton travelling southbound. Given the time of day, around 1:20 pm, four lanes of traffic with two in each direction, I determined that there was plenty of space on the roadway to safely go around the other vehicles on the [sic] Stanton. Additionally, I was very familiar with the area as I worked out of the Westside Regional Command Center and the incident occurred in broad daylight, with clear weather and roadway conditions, and no issues with visibility. I considered these circumstances and conditions in making my decision to continue to follow and maintain visual contact with the suspects' vehicle as they are related to the risk of harm to the

4

public. As with any type of pursuit or response to any emergency situation, there is a risk of harm to innocent drivers and bystanders but based on the circumstances and conditions at the time, and my experience and training, I determined that it was reasonable to continue following because the need to maintain a visual contact and ultimately apprehend the suspects and stop their continuation of other serious offenses outweighed any risk to the public. Just because the risk of harm to the public ultimately occurred, I do not believe that the actions of me and my colleagues were in any way unreasonable or reckless under the circumstances. Given that the suspects were traveling at a high rate of speed and weaving in and out of travel, I determined based on this conduct that the suspects did not have any regard for the safety of others and were only concerned with fleeing the immediate area where they had just committed a serious offense. Further, I did not proceed through any red lights or stop signs until it was safe to do so.

Villalobos also stated he was "driving in an unmarked vehicle" that "did not have any police lights." He also claimed that the only alternatives to following Roacho and Sanchez as he did was to "to pull back and lose visual contact of the suspects" or "to only drive at the posted speed limit," either of which, "would have likely allowed them to get away."

Officer Herrera did not provide any additional facts in his affidavit regarding the officers' need to follow Roacho and Sanchez, other than stating "Officer Villalobos and the rest of the TAC Unit officers involved determined that the immediate apprehension of the suspects was necessary given the nature of the offense and the manner in which the suspects were driving." He provided an assessment of the risk posed to the public by their chase that closely mirrored Villalobos's:

10. In an attempt to conduct a controlled stop of the suspect vehicle, I had to travel at a rate of speed faster than the regular traffic on Stanton travelling southbound. Given the time of day, around 1:30 p.m., four lanes of traffic with two in each direction, I determined that there was plenty of space on the roadway to safely go around the other vehicles on the [sic] Stanton, especially since I had activated my lights and siren. Additionally, I was very familiar with the area as I worked out of the Westside Regional Command Center and the incident occurred in broad daylight, with clear weather and roadway conditions, and no issues with visibility. I considered these circumstances and conditions in making my decision to continue to proceed in an effort to catch up to the suspect vehicle. As with any type of response to any emergency situation, there is a risk of harm to innocent drivers and bystanders but based

on the circumstances and conditions at the time, and my experience and training, I determined that it was reasonable to continue because the need to ultimately apprehend the suspects and stop their continuation of other serious offenses outweighed any risk to the public. Although it is unfortunate that the risk of harm to the public ultimately occurred, I do not believe that the actions of me and my colleagues were in any way unreasonable or reckless under the circumstances. Given the suspects were traveling at a high rate of speed and weaving in and out of the lanes, it is safe to say that based on this conduct that the suspects did not have any regard for the safety of others and were only concerned with fleeing the immediate area where they had just committed a serious offense. Further, I did not proceed through any red lights or past any stop signs. In fact, once I had activated my lights and siren to turn on to Stanton headed southbound, I only had green lights at the intersections.

El Paso also submitted an expert report prepared by Kelley E. Stone, Ph.D. Stone opined that there were no alternatives to Villalobos's course of action: "The alternative for Villalobos would be not to follow or to follow at the posted speed limit, either of which may have resulted in losing the suspects—so there were no reasonable alternatives to identify or apprehend the suspects." Stone also stated that a reasonably prudent officer in Villalobos's position would have assessed the need to follow the suspects as outweighing the risk posed to the public:

4.  Officer Villalobos was the closest police unit with visual contact of the suspects and their car. The suspects were traveling at a high rate of speed from the time they left the driveway at [the house]. A reasonably prudent officer could have believed that if he did not follow them, no other police unit could reasonably locate or follow the suspects. If Officer Villalobos did not follow the suspects, the suspects may have gotten away. To maintain visual contact with the suspects' vehicle, a reasonably prudent officer would have had to travel faster than the regular traffic on Stanton. Given the time of day, 13:20 hours, the number of lanes on the street, 4 (2 in each direction), and the amount of traffic on the street, moderate according to Officer Villalobos, any risk to the other drivers associated with Officer Villalobos following at the speed he was traveling was outweighed by the need to identify and apprehend the suspects.

The trial court orally denied the plea to the jurisdiction after a hearing. It issued a written denial a week later. This appeal followed.

6

## II. STANDARD OF REVIEW

The standard of review here is the same as in *Cangialosi I.* There, we explained that governmental immunity protects state political subdivisions from lawsuits based on their performance of governmental functions unless the State has expressly waived its immunity. *Cangialosi*, 632 S.W.3d at 619 (citing *El Paso v. Heinrich*, 284 S.W.3d 366, 370 (Tex. 2009)). "Police protection is a governmental function." *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(1)). As a result, El Paso is immune from lawsuits seeking monetary damages unless its immunity is waived. *Id.*

Because immunity from suit defeats a trial court's subject matter jurisdiction, such immunity is properly asserted in a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). A plea to the jurisdiction can challenge either the pleadings or the existence of jurisdictional facts. *Id.* at 226-27. "As here, when a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties." *Cangialosi*, 632 S.W.3d at 619 (citing *Miranda*, 133 S.W.3d at 226). "If there is no question of fact as to the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law." *Id.* (quoting *Heinrich*, 284 S.W.3d at 378). "If, however, the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder." *Id.* at 620 (quoting *Heinrich*, 284 S.W.3d at 378). "'This standard mirrors our review of summary judgments' where the reviewing court takes as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor." *Id.* at 620 (quoting *Heinrich*, 284 S.W.3d at 378). We review a plea challenging the trial court's jurisdiction de novo. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007).

7

## III. DISCUSSION

El Paso presents three issues for this Court to consider. First, it claims the trial court erred when it denied its second plea to the jurisdiction because the EPPD officer's official immunity makes the TTCA's motor-vehicle waiver to its general governmental immunity inapplicable. Second, it argues the trial court should have granted its plea to the jurisdiction even if the motor-vehicle waiver applies because the emergency situation response exception found in Texas Civil Practice and Remedies Code § 101.055(2) applies. Third, it claims the trial court erred when it denied its plea to the jurisdiction because the intentional act exception found in § 101.057(2) applies.

### A. Waiver of governmental immunity under the TTCA

In its first issue, El Paso argues the EPPD officer's official immunity makes the TTCA's motor-vehicle waiver inapplicable to its general governmental immunity. Appellees claim that the TTCA's motor-vehicle waiver applies to waive El Paso's governmental immunity. The motor-vehicle waiver makes a state government unit liable for personal injury or death, inter alia, if two conditions are met: (1) the personal injury or death "arises from the operation or use of a motor-driven vehicle . . ."; and (2) "the employee would be personally liable to the claimant according to Texas law[.]" TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1). In *Cangialosi I*, we held the facts were sufficient to show the possibility of a nexus between EPPD's vehicle use and the accident that injured the Appellees to defeat El Paso's plea to the jurisdiction. *Cangialosi*, 632 S.W.3d at 626. El Paso now relies on the waiver's second element, arguing Appellees cannot produce evidence that the officers involved in the accident would be liable to Appellees under Texas law. Specifically, it argues that the officers involved in the March 4 accident are protected by official

immunity and are therefore not personally liable to Appellees. Consequently, according to El Paso, it is immune from suit. We disagree.

*Official immunity*

Official immunity is an affirmative defense that protects government employees from personal liability. *University of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000). A government employee is entitled to official immunity if he establishes that (1) he was performing a discretionary duty (2) within the scope of his employment and (3) acted in good faith. *Id.* (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994)). A government entity is not liable under the TTCA for the actions of its employees if the employees are protected by official immunity. *DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex. 1995). Because official immunity is an affirmative defense, the burden is on the government to conclusively prove each element of the defense. *Clark*, 38 S.W.3d at 580; *Texas Dep't of Public Safety v. Bonilla*, 481 S.W.3d 640, 643 (Tex. 2015) ("Summary judgment on official immunity requires that a movant establish facts upon which the court could base its legal conclusion . . . ."). "[T]estimony on good faith must discuss what a reasonable officer could have believed under the circumstances, and must be substantiated with facts showing that the officer assessed both the need to apprehend the suspect and the risk of harm to the public." *Clark*, 38 S.W.3d at 581.

Appellees do not dispute that the officers involved in the accident were performing a discretionary duty within the scope of their employment with EPPD. As a result, we consider the first two elements of the official immunity analysis as established and focus only on whether the officers acted in good faith.

9

*Good faith*

"Good faith is a test of objective legal reasonableness." *Bonilla*, 481 S.W.3d at 643. A law enforcement officer can establish good faith in a pursuit case such as this by "proving that a reasonably prudent officer, under the same or similar circumstances, could have believed the *need* for the officer's actions outweighed a clear *risk* of harm to the public from those actions." *Id.* (emphasis added). "The 'need' aspect of the test refers to the urgency of the circumstances requiring police intervention," including factors "such as the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result." *Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex. 1997); *see also Clark*, 38 S.W.3d at 582 ("We agree with Clark that the *Wadewitz* need and risk factors apply to good faith determinations in police pursuits as well as emergency responses.").

> The "risk" aspect of good faith, on the other hand, refers to the countervailing public safety concerns: the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer.

*Wadewitz*, 951 S.W.2d at 467.

The Texas Supreme Court has held this good-faith standard to be "analogous to an abuse-of-discretion standard that protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Bonilla*, 481 S.W.3d at 643. Consequently, "[g]ood faith does not require proof that all reasonably prudent officers would have resolved the need/risk analysis in the same manner under similar circumstances." *Id.* Thus, if the government meets its burden of proof of conclusively showing the officer acted with objective reasonableness, good faith is established "unless the

plaintiff shows that *no* reasonable person in the officer's position could have thought the facts justified the officer's actions." *Id.* Therefore, evidence that a reasonable officer could have resolved the need/risk analysis differently does not overcome competent evidence of good faith. *Id.* at 644.

El Paso argues that Villalobos's and Herrera's sworn affidavits and Stone's expert report "sufficiently demonstrate[d] that the officers deliberately considered and weighed the need and risk factors and determined that a reasonably prudent officer in the same or similar circumstances could have agreed with their course of action."[1] We disagree that the evidence conclusively shows the officers appropriately assessed the risk factors.

*Need factors*

Villalobos appropriately assessed the *need* to follow the suspects. In his affidavit, he describes the probable cause he developed that he had just witnessed a burglary, the evidence he had that the suspects had committed a previous burglary, and his belief that they would continue to commit burglaries in the future if not immediately apprehended. He also described that he needed to "travel at a rate of speed faster than the regular traffic on Stanton" to maintain visual contact with the suspects' speeding vehicle.

Appellees claim Villalobos failed to address all the *Wadewitz* factors related to need because he failed to consider alternatives to a high-speed chase. Specifically, they claim the officers could have stopped the suspects before they left the house. Villalobos, however, addressed this option and explained it was not a viable one because of the risk it posed to both the officers

---

[1] El Paso also appears to be arguing that because its officers were not in "pursuit" of the suspected burglars as that term is defined by the EPPD Vehicular Pursuit Policy, the need/risk factors outlined by the Texas Supreme Court in *Wadewitz* do not apply. However, we held in *Cangialosi I* that the Appellees have at least raised a fact issue as to whether there was a "pursuit" at the time of the accident.

11

and any individuals who may have been in the home. While a reasonable officer may disagree with Villalobos's analysis, "[g]ood faith does not require proof that all reasonably prudent officers would have resolved the need/risk analysis in the same manner under similar circumstances." *Bonilla*, 481 S.W.3d at 643. As a result, Villalobos's assessment of why the suspects were not stopped at the house complies with the good-faith standard.

Appellees also argue the officers could have let the suspects go without a chase and arrested them later because they had identified the registered address of the suspects' vehicle. Indeed, the record shows that Villalobos was aware of the vehicle's registered address before the suspects sped away from the house. Yet he does not address this alternative in his affidavit. Instead, he states that the only alternatives to the high-speed chase were "to pull back and lose visual contact of the suspects" or "to only drive at the posted speed limit," either of which "would have likely allowed them to get away." It would have been helpful had Villalobos addressed whether he considered this alternative and why he did not consider it a viable option. However, his failure to do so is not fatal to a finding of good faith. The Texas Supreme Court has explained that "just because an officer has identified a suspect and could apprehend him later but decides to pursue the suspect anyway cannot alone defeat good faith." *Clark*, 38 S.W.3d at 588.

*Risk factors*

While the officers appropriately assessed the need to follow the suspects, the officer's risk assessment was deficient. Officer Villalobos stated "[g]iven the time of day, around 1:20 pm, four lanes of traffic with two in each direction, I determined that there was plenty of space on the roadway to safely go around the other vehicles on the [sic] Stanton." He continued that he was "very familiar with the area," that the "incident occurred in broad daylight, with clear weather and roadway conditions, and no issues with visibility." He said he considered these conditions in

12

deciding to "travel at a rate of speed faster than the regular traffic on Stanton" to maintain visual contact with the suspects. Officer Herrera considered the same conditions in deciding to "travel at a rate of speed faster than the regular traffic on Stanton" to conduct a controlled stop in his marked police unit. Dr. Stone echoed both Officers Villalobos and Herrera by concluding that "[t]o maintain visual contact with the suspects' vehicle, a reasonably prudent officer would have had to travel faster than the regular traffic on Stanton."

This evidence is not sufficient to show that Officers Villalobos and Herrera adequately assessed the risks of chasing Roacho and Sanchez. El Paso was required to show, with substantiated facts, that Officers Villalobos and Herrera assessed the nature and severity of harm that their actions could cause, including injuries to bystanders. *Wadewitz*, 951 S.W.2d at 467; *Clark*, 38 S.W.3d at 581. The officers' affidavits check the boxes regarding the time of day and road and weather conditions, which are important factors they must consider in deciding to continue a high-speed chase. Yet the officers do not provide any details regarding their assessment of the risk their speed caused to the general public present that day on Stanton Street. Officers Villalobos and Herrera and Dr. Stone's only mention of speed is that the officers were "traveling faster than the regular traffic on Stanton." All three ignore the fact that the officers were traveling at least double the posted speed limit, and none give any indication of how fast traffic was moving at the time. For example, Officer Villalobos traveling at 60 miles per hour while the rest of the traffic is going 10 miles per hour poses a significantly different risk than him going the same speed while the rest of traffic is going 50 miles per hour. El Paso does not provide any evidence that would allow a court to determine whether the officers' risk assessment was objectively reasonable.

Further, while Officer Villalobos indicates that he was "driving an unmarked vehicle" without "any police markings and did not have any police lights," he did not provide any evidence

13

indicating he assessed the risk of driving at least double the speed limit without any way of alerting the public to the danger he posed coming down Stanton Street. As a result, El Paso's evidence does not conclusively establish its claim that Officers Villalobos and Herrera were acting in good faith.[2]

*Conclusion*

Having found that El Paso did not meet its initial burden of establishing good faith, we need not consider whether Appellees successfully controverted El Paso's evidence. *Clark*, 38 S.W.3d at 588. Accordingly, we find the trial court did not err in denying El Paso's plea to the jurisdiction and overrule El Paso's first issue.

### B.  Emergency exception

In its second issue, El Paso argues Appellees' claims fall within the TTCA's emergency exception. If they do, then § 101.021(1)(A) does not waive El Paso's immunity from those claims even if they would otherwise fall within the scope of that waiver. *City of San Antonio v. Maspero*, 640 S.W.3d 523, 529 (Tex. 2022); TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A).

> The TTCA
>
> does not apply to a claim arising
>
> . . . .
>
> from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others[.]

---

[2] We do not express an opinion on whether El Paso could have conclusively established good faith if Officers Villalobos or Herrera had presented evidence regarding their assessment of the risk their speed caused to the general public. Today's holding only recognizes that the lack of evidence regarding their speed precludes a finding of good faith.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2). The Appellees bear the burden of negating § 101.055's applicability. *Maspero*, 640 S.W.3d at 529. Appellees do not dispute that the officers in this case were responding to an emergency situation. Therefore, they had the burden of raising a fact issue that the officers either (1) violated a law or ordinance applicable to an emergency response, or (2) (absent an applicable law or ordinance) acted with reckless disregard for the safety of others. *Id.*

*Ordinance applicable to an emergency response*

Appellees identify City of El Paso Ordinance 12.12.010 as applicable here; this ordinance gives emergency vehicle drivers in the city privileges to transgress certain traffic laws in emergency situations. The relevant portion of the ordinance that allows an emergency vehicle to drive faster than the posted speed limit states: "The driver of an emergency vehicle may . . . [e]xceed the prima facia speed limits when such vehicle is operated . . . in the immediate pursuit of an actual or suspected violator of the law . . . ." EL PASO, TEX., CODE OF ORDINANCES ch. 12.12, § 010(B)(3) (2016). But this allowance is provided only if the emergency vehicle uses appropriate warning signals:

> The exemptions herein granted to an authorized emergency vehicle shall apply only when the driver of any such vehicle while in motion sounds audible signal by bell, siren or exhaust whistle, *as may be reasonably necessary*, and/or when the vehicle is equipped with at least one lighted lamp displaying a red light visible under normal atmospheric conditions from a distance of five hundred feet to the front of such vehicle, except that an authorized emergency vehicle operated as police vehicle need not be equipped with or display a red light visible from in front of the vehicle.

EL PASO, TEX., CODE OF ORDINANCES ch. 12.12, § 010(C) (2016) (emphasis added).

Appellees contend Officer Villalobos violated this ordinance when he sped in response to an emergency situation without sounding an audible signal by siren or other means. While it is

15

undisputed that the car Officer Villalobos was driving did not have any type of audible siren, El Paso responds that sirens are only needed "as may be reasonably necessary."

We find the record raises a fact issue regarding whether it was "reasonably necessary" for Officer Villalobos to have needed an audible signal or siren. Officer Villalobos does not provide any details in his affidavit regarding his decision to follow the suspects without a siren; he only generally claims that his actions in following the suspected burglars was reasonable and in no way reckless. Yet Officer Herrera conditioned the reasonableness of his speed that day, at least in part, on the fact that he had lights and sirens: "Given the time of day, around 1:30 p.m., four lanes of traffic with two in each direction, I determined that there was plenty of space on the roadway to safely go around the other vehicles on the [sic] Stanton, *especially since I had activated my lights and siren*." Further, another officer in an unmarked unit that day testified that he did not think it was safe for him to speed that day because of the heavy traffic present on Stanton Street. As a result, we are left with a question of fact regarding the reasonableness of Villalobos's actions in speeding in a vehicle without audible sirens. Because there is a fact question regarding whether Villalobos violated an El Paso ordinance applicable to emergency situations, the trial court did not err in denying the plea to the jurisdiction. Consequently, we overrule El Paso's second issue.

### C. Intentional tort exception

In its third issue, El Paso argues Appellees' claims fall within the TTCA's intentional tort exception: § 101.057 of the TTCA does not apply to a claim "arising out of assault, battery, false imprisonment, or any other intentional tort . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 101.057. The Texas Supreme Court has held that the TTCA's intentional tort exception applies only when it is the intentional tort of a governmental employee whose conduct is the subject of the complaint.

16

*Delaney v. University of Houston*, 835 S.W.2d 56, 59 (Tex. 1992). Appellees' claims here stem from El Paso's alleged negligence. There is no allegation in this case that any of the EPPD officers committed an intentional tort. Consequently, the intentional tort exception is inapplicable. We overrule El Paso's third issue.

## IV. CONCLUSION

Because the trial court did not err in denying El Paso's plea to the jurisdiction, we affirm its judgment.

LISA J. SOTO, Justice

April 11, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.